# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 2097 | **DATE** | 3/28/2003 |
| **CASE TITLE** | Willie Mae Hawkins vs. Jo Anne Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** Plaintiff's motion for summary judgment [doc. # 17] is denied, and the Government's motion for summary judgment [doc. # 22] is granted. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | **number of notices** | **Document Number** |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 31 2003 | | |
| | Notified counsel by telephone. | | **date docketed** | | |
| | Docketing to mail notices. | | | | 26 |
| | Mail AO 450 form. | | **docketing deputy initials** | | |
| | Copy to judge/magistrate judge. | | 3/31/2003 | | |
| JJK | courtroom deputy's initials | | **date mailed notice** | | |
| | | | JJK | | |
| | | | **mailing deputy initials** | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
MAR 2 1 2003

WILLIE MAE HAWKINS,      )
      )
      Plaintiff,      )
      )
vs.      )    No. 02 C 2097
      )    Magistrate Judge Schenkier
JO ANNE BARNHART,      )
Commissioner of Social Security,      )
      )
      Defendant.      )

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Willie Mae Hawkins, seeks judicial review of a final decision by the
Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her
claim for Social Security Income ("SSI"). On August 22, 1997, Ms. Hawkins filed an application
for SSI, alleging a disability beginning on October 28, 1996 caused by seizures, back and leg pain,
depression and asthma (R. 20). The Agency found that Ms. Hawkins was not disabled, both initially
and again upon reconsideration (R. 37 - 44). On February 8, 1999, Ms. Hawkins, represented by
counsel, appeared at a hearing before an Administrative Law Judge ("ALJ") (R. 17). The ALJ
subsequently issued a written decision, dated October 29, 1999, denying Ms. Hawkins SSI benefits
(R. 17-30). Ms. Hawkins filed a Request for Review and, on February 1, 2002, the Appeals Council
denied the request (R. 6-7). Therefore, the decision of the ALJ is the final decision of the
Commissioner and is subject to judicial review by the district court. *See Luna v. Shalala*, 22 F.3d

---

[1]By consent of the parties and pursuant to 28 U.S.C. § 636(c), the case has been assigned to this Court for all
proceedings, including the entry of final judgment (doc. ## 10-12).

687, 689 (7th Cir. 1994). Ms. Hawkins subsequently filed a timely complaint in federal court seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Ms. Hawkins now seeks summary judgment reversing the Commissioner's decision denying her SSI or, in the alternative, remanding the case for further proceedings (doc. # 17). The Commissioner has filed a cross-motion for summary judgment to affirm her decision below (doc. # 22). For the reasons stated below, the Court grants the Commissioner's motion for summary judgment and denies Ms. Hawkins' motion for summary judgment.

## I.

The following facts are taken from the administrative record, the administrative hearing transcript, and the ALJ's written decision. We will set forth the plaintiff's personal and medical history first, followed by a summary of the administrative hearing testimony and the ALJ's written decision.

## A.

Ms. Hawkins was born on June 21, 1950, and was 49 years old at the time of the ALJ's decision (R. 19). She has a tenth grade education, and has obtained four months of certified nursing assistant ("CNA") training (Id.). Ms. Hawkins previously has been employed as a sitter and as a CNA, but has not worked since April 1996 when she injured her back while lifting a patient at work (R. 315, 320).

Ms. Hawkins and her grandson live in the house of the plaintiff's boyfriend with the boyfriend and the boyfriend's daughter (R. 313). Ms. Hawkins is the primary caregiver for her fourteen year-old grandson and she occasionally goes shopping with him (R. 352). Ms. Hawkins testified that, otherwise, her daily activities are determined by whether it is a "good day" or a "bad

2

day" (R. 342, 343). On a bad day, all she can manage is to wash up, watch television, work on a puzzle book, and maybe wipe down the mirror (*Id*.). On a good day, the plaintiff feels well enough to do some laundry in the basement (R. 342). Ms. Hawkins estimates that she has about four or five bad days, and two or three good days in any given week (R. 343). Nevertheless, Ms. Hawkins cooks for herself every day (R. 341), though she has stopped doing any grocery shopping (R. 343). Ms. Hawkins used to enjoy playing bingo, but no longer plays due to financial – not physical or mental – constraints (R. 135).

The plaintiff claims that her various physical impairments make it difficult for her to engage in many physical activities for any extended period of time. She has had a history of seizures since she fell at the age of 23, a time when she was drinking "a whole lot" and "everyday" (R. 133). Moreover, Ms. Hawkins has experienced back pain since her injury at work, even after her surgery (R. 80, 127). She is unable to sit for more than twenty to twenty-five minutes before she experiences severe pain for which she must take Motrin (R. 323). Additionally, she can stand for only ten to fifteen minutes before her legs start to feel numb (R. 80, 321). Ms. Hawkins is limited to short walks before both her legs begin to shake and she loses her balance (R. 323-324 ), and she quickly becomes short of breath when she runs (R. 325). Ms. Hawkins has experienced significant weight fluctuation since her back surgery (R. 134, 333). All this limits her to simple tasks around the home (R. 80), and she often feels depressed and has crying spells (R. 330-331).

**B.**

After being injured while lifting a patient at work in April 1996, Ms. Hawkins underwent back surgery on October 28, 1996 (R. 127). There are no medical records from this period in the

official record for this case. The first relevant medical evidence available in the record dates back to March 1997. We will review the medical evidence in chronological order.

Ms. Hawkins was hospitalized at Roseland Community Hospital from March 7-8, 1997 after complaining of chest pains (R. 108-119, 192-213). Cardiac testing revealed that there was no impairment (R. 117-119). However, having been made aware of Ms. Hawkins' history of seizures, hospital testing of the plaintiff's medication levels revealed the level of her seizure medication (Dilantin) was well below the normal range (R. 110).

On September 19, 1997, the plaintiff's treating physician, Dr. Ram Thawani, provided the Agency with a telephone report on the plaintiff's condition (R. 120). Dr. Thawani disclosed that the plaintiff's back surgery had consisted of a lumbar laminectomy at L5-S1 (*Id.*). Dr. Thawani also noted that Ms. Hawkins' range of motion was decreased, although there had been no recent measurements taken and she was able to walk without a cane (*Id.*). The plaintiff complained of pain, episodic breathing difficulties, and also of tingling and numbness on both sides (*Id.*). However, Dr, Thawani was unsure whether this tingling and numbness had a physical etiology (*Id.*). Additionally, the plaintiff's lungs were clear, there was no end-organ damage, and the doctor had never witnessed an asthma attack (*Id.*). Dr. Thawani expressed doubts as to the plaintiff's compliance with her asthma and seizure medications (*Id.*). Finally, while Dr. Thawani commented that the plaintiff was depressed and tearful, he attributed this to a lawsuit the plaintiff was involved in with her former employer (*Id.*).

On October 9, 1997, Ms. Hawkins underwent a radiological evaluation of her lumbosacral spine (R. 123). In his radiological report, Dr. Eugene Kovalsky noted that the examination showed mildly "advanced degenerative changes involving the lower lumbar facets with degenerative disc

4

pathology at L4-L5" (*Id.*). Also noted was sclerosis at the articulating surfaces with moderate proliferative changes (*Id.*).

On that same day in October 1997, Dr. Facundo Dovale performed an Internal Medicine Evaluation at the Agency's request (R. 127-131). The plaintiff's chief complaints at that time were noted to be a history of low back pain, asthma and seizure disorder, in addition to depression (R. 127). Upon physical examination, Dr. Dovale noted that the plaintiff was 5 feet, 6 ½ inches tall, weighed 226 pounds, and had a blood pressure reading of 150/100 in the right arm and 160/100 in the left arm (R. 129). It was further noted that the plaintiff had a slight limp favoring her right lower extremity, but was able to get on and off the examination table without the use of a cane (*Id.*).

The plaintiff was tearful while relating her medical and personal history (*Id.*). That history included a denial of any history of drug or alcohol abuse, but an admission by the plaintiff that she did drink heavily on some occasions (R. 128). Additionally, the plaintiff smoked a half a pack of cigarettes a day at the time, which was less than in the past (*Id.*). The plaintiff claimed that she did no lifting, but was able to bathe, dress, dust and fix light meals for herself at home (R. 127-128).

As to the plaintiff's back pain, Dr. Dovale's examination revealed some tenderness, but no appreciable paravertebral muscle spasm (R. 130). Additionally, the lumbosacral spine range of motion was normal on upon flexion, extension and side-to-side bending testing (*Id.*). Ms. Hawkins further demonstrated a full range of motion (at the hips, knees and ankles), an absence of muscular atrophy and an ability to heel/toe walk (*Id.*). Finally, Ms. Hawkins was able to complete straight leg raising of the right lower extremity pain free to 90 degrees, and experienced slight low back pain and pain in her left buttock upon raising the right side to 60 degrees (*Id.*).

As to the plaintiff's breathing difficulties, Dr. Dovale noted slightly decreased breath sounds in both lung fields bilaterally (*Id.*). However, the air exchange was good and there was no wheezing, peripheral clubbing, cyanosis or edema (*Id.*). Additionally, spirometry tests performed on the same day revealed some mild restriction prior to the use of a bronchodilator and a normal spirometry after medication (R. 21, 130).

Based on his examination, Dr. Dovale's overall clinical impressions were that the plaintiff suffered from: chronic low back pain without evidence of radiculopathy; a history of asthma, which appeared mild by physical examination; a history of seizure disorder, which appears to be uncontrolled despite her taking Phenobarbital and Dilantin; elevated systolic and diastolic blood pressure; and a history of depression (R. 131). Dr. Dovale noted that further attention to the issue of depression would be deferred pending a psychiatric consultative evaluation to occur later that day (R. 128).

That psychiatric examination was completed on October 9, 1997, by Dr. Donna Luchetta (R. 133-137). Dr. Luchetta described Ms. Hawkins as a well groomed and cooperative person, who used a cane to walk, and had difficulty rising up from a chair (R. 133). Ms. Hawkins stated that her problems began when she developed seizures at age 23 – a time when she was drinking alcohol "a whole lot" and "everyday" (*Id.*). While Ms. Hawkins did claim to have abstained from alcohol for the last six or seven months, she also stated that she had taken a little "shot of brandy" a week before the examination (*Id.*). Ms. Hawkins complained of back pain, crying spells, a 50-75 pound weight gain since her back injury, and difficulty sleeping (R. 134). There had been no past history of psychiatric hospitalization, however (*Id.*). Ms. Hawkins identified her daily activities as including

6

cooking, doing the laundry, watching television, reading, doing crossword puzzles and taking care of her finances (*Id.*).

Dr. Luchetta observed that Ms. Hawkins appeared sad and slightly withdrawn, making only occasional eye contact and remaining "tearful throughout much of the examination" (*Id.*). Ms. Hawkins also exhibited slight psychomotor retardation and a restriction in her range of emotions (*Id.*). On the other hand, Dr, Luchetta noted that Ms. Hawkins showed a good stream of conversation, sequential thought processes, and acceptable impulse control (R. 135-136). Furthermore, there was no indication that Ms. Hawkins suffered from any special preoccupation, confusion, hallucination, or delusion (*Id.*). Nor was there any evidence of suicidal or homicidal ideation (R. 135).

Dr. Luchetta found that Ms. Hawkins performed adequately on tests inquiring into orientation, memory, recent and remote memory, calculation, and abstract thinking, with one exception (R. 136). The one exception consisted of several occasions where the plaintiff reversed pairs of numbers in a digit recall test designed to determine the plaintiff's memory capacity (*Id.*). Dr. Luchetta indicated that "[t]his seemed to have been done purposely, as the answers were very close approximations" (*Id.*). In the end, Dr. Luchetta diagnosed Ms. Hawkins with alcohol dependence in partial early remission (*Id.*).

On October 22, 1997, Ms. Hawkins was treated in the emergency room at Provident Hospital (R. 138-140). Ms. Hawkins had bruised her right leg and was in pain (R. 138). Ms. Hawkins was discharged on the same day with instructions to take Motrin as needed (R. 140).

Shortly thereafter, on November 18, 1997, Agency reviewer Kirk W. Boyenga, Ph.D., completed a Psychiatric Review Technique Form (R. 141-149) and a Mental Residual Functional Capacity Assessment (R. 150-153). In the Psychiatric Review, Dr. Boyenga noted that Ms. Hawkins' medical records indicated evidence of a substance addiction disorder (R. 147). But, it was Dr. Boyenga's opinion that this impairment created only a slight limitation in her ability to take part in the activities of daily living and her ability to maintain social functioning (R. 148). And, while Dr. Boyenga found evidence that Ms. Hawkins might on some occasions experience deficiencies in concentration, persistence or pace, there was no evidence that Ms. Hawkins ever experienced an episode of deterioration or decompensation in a work or work-like setting (*Id.*). In the Mental Residual Functional Capacity assessment, Dr. Boyenga again noted that Ms. Hawkins suffered from a substance addiction (R. 152), and found that the one significant restriction that resulted therefrom was a moderate restriction in her ability to maintain attention for extended periods (R. 150). The doctor elaborated that Ms. Hawkins' "[c]oncentration is impaired, but allows performance of simple and semi-skilled tasks" (R. 152).[2]

On November 18, 1997, Agency reviewer Dr. Julius Calvo Villaflor, issued a Physical Residual Functional Capacity Assessment (R. 154-162). The results of this assessment include a finding that Ms. Hawkins is able to lift 50 pounds occasionally and 25 pounds frequently (R. 155). Additionally, Ms. Hawkins was found to be able to sit, walk or stand for six hours in an eight-hour workday (*Id.*). Finally, it was noted that Ms. Hawkins should kneel or crawl no more than

---

[2] On April 28, 1998, another agency reviewer, psychologist Jerrold Heinrich, Ph.D., also reviewed the record and affirmed Dr. Boyenga's assessment (R. 141, 152).

occasionally, and should avoid ladders, climbing ropes, scaffolding and workplace hazards altogether (R. 156, 158).[3]

On December 18, 1997, Ms. Hawkins was again treated in an emergency room, this time at Cook County Hospital (R. 163-165). Ms. Hawkins went to the hospital after experiencing back pain for one week (R. 163). Ms. Hawkins was again discharged on the same day with instructions to take pain medication as needed (R. 165).

Thereafter, on October 7, 1998, Ms. Hawkins underwent a psychological assessment by a psychologist, Dr. Mark Langgut (R. 166-172). Dr. Langgut described Ms. Hawkins as an adequately groomed and dressed person, whose speech was clear and direct (R. 166). He commented that her eye contact was "rather poor," her answers were often slow and deliberate, and she walked slowly (albeit without assistance) (*Id.*). Moreover, Ms. Hawkins weighed 230 pounds, having gained 30 pounds in the preceding four to five months (R. 168). Ms. Hawkins indicated that she was living with her boyfriend and that her daily activities included cooking, limited housekeeping, paying bills and shopping with assistance (*Id.*).

Dr. Langgut observed that Ms. Hawkins was cooperative throughout the examination, but exhibited a sad, tearful and fretful demeanor (*Id.*). Dr. Langgut said Ms. Hawkins' sadness was related to her limited level of ability, concern over her future, her physical pain, as well as her recent weight gain (*Id.*).

Dr. Langgut administered several standard psycho-diagnostic tests, including the Michigan Alcohol Screening Test, the Beck Depression Inventory, and the Minnesota Multiphasic Personality

---

[3] On May 5, 1998, yet another agency reviewer, agency physician Dr. Francis Vincent, reviewed the record and affirmed Dr. Villaflor's assessment (R. 161).

9

Inventory- Index II ("MMPI") (R. 169). Dr. Langgut noted that during the testing, Ms. Hawkins seemed distracted and was "generally preoccupied with advancing her own agenda (*i.e.*, discussing her [l]imitations and pain . . .") (R. 168). As to the Michigan Alcohol Screening Test, while Ms. Hawkins denied any problems or difficulties in this area, Dr. Langgut nonetheless expressed concern regarding "a history (and possible current use/abuse) of alcohol" (R. 169-170). Dr. Langgut's notes regarding the Beck Depression Inventory indicate that while Ms. Hawkins does not appear to be a suicide threat, she does exhibit a number of depressive qualities (R. 169). Finally, Dr. Langgut deemed the results of the MMPI as inconclusive, because they presented "evidence of an invalid profile" (*Id.*). Dr. Langgut went on to state:

> [Ms. Hawkins] presented with significant elevations in nearly all scales rendering any meaningful generalizations of personality virtually impossible. She appears to have naively endorsed nearly all indicators of pathology in an attempt to underscore her difficulties and problems. However, due to this manner of responding, she has obscured any meaningful generalizations from this measure.

(*Id.*). In the final "Recommendations" portion of his report, Dr. Langgut summarized his impressions (R. 170). He concluded, "[Ms. Hawkins] would appear to require some degree of support, structure and a therapeutic outlet in which she can discuss those areas of depression that she feels on a daily basis" (*Id.*).

Dr. Langgut also completed a "Medical Assessment of Ability to Do Work-Related Activities (Mental)" Form (R. 171-172). His responses on this form indicate his opinion that Ms. Hawkins is unable to "understand, remember and carry out complex job instructions," and at least "seriously limited, but not precluded" in her ability to relate to co-workers, deal with the public, use judgment, deal with work stresses, function independently, maintain her attention/concentration, and behave in an emotionally stable manner (*Id.*). Furthermore, it was Dr. Langgut's opinion that Ms. Hawkins

10

was "limited, but satisfactory" to "seriously limited, but not precluded" in her ability to "[u]nderstand, remember and carry out detailed but not complex, job instructions;" was no worse than "limited, but satisfactory" to follow work rules and interact with supervisors; and was somewhere between "more than satisfactory" and "limited, but satisfactory" in her ability to "[u]nderstand, remember and carry out simple job instructions" (*Id.*). Dr. Langgut qualified these findings by stating that, "[l]imitations in a work related environment appear largely to be the result of physical pain and restrictions" (R. 172).

In November and December of 1998, Ms. Hawkins was treated in the Roseland Hospital Emergency Room on two occasions for temporary, unrelated medical issues (R. 174-180). However, on a third visit in late December of that year, Ms. Hawkins went to Roseland following a seizure (R. 181-191). Testing again showed Ms. Hawkins' seizure medications to be well below the normal range (R. 185).

The record also includes records from the City of Chicago Department of Public Health, where Ms. Hawkins received treatment from December 1998 through August 1999 (R. 236-274, R. 278-299). Over that period, Ms. Hawkins complained of and was treated for her asthma, low back pain, leg cramps, abdominal pain, a toothache, numbness in the legs, and seizures (*Id.*). On a number of occasions it was noted that Ms. Hawkins had run out of her asthma or seizure medications or that the level of her seizure medication was low (R. 246, 248-249, 251, 253).

On August 17, 1999, Ms. Hawkins underwent a magnetic resonance imaging ("MRI") of her lumbar spine at Cook County Hospital (R. 276-277). The results of this exam indicated a mild degree of spondylolisthesis at L4-L5 (R. 276). Also noted was degeneration of the L4-L5 and L5-S1 discs (*Id.*). Further, at the L5-S1 level the specific findings indicated minimal disc bulging, facet

11

arthropathy, prominent epidural fat, and a small thecal sac, but no definite disc herniation, significant central canal stenosis or significant foraminal narrowing (*Id.*). At the L4-L5 level, the findings indicate a narrowing of the disc space, disc bulging, advanced facet arthropathy, spinal stenosis, moderate thecal sac deformity, clumping of the intradural nerve roots (possibly due to the stenosis) and a suggestion of ligamentum flavum hypertrophy (R. 276-277). There was no evidence of definite focal disc herniation at this level (R. 276). Finally, there was evidence of mild disc bulging and mild central canal stenosis at the L3-L4 level (R. 277).

Finally, there is some other material in the record from the Cook County Hospital Emergency Room (R. 214-235). Ms. Hawkins was seen there (in addition to the specific instances discussed above) five times from May 1, 1996 to August 1, 1999 (*Id.*). Only one of these visits seem particularly relevant here. On August 8, 1998, Ms. Hawkins visited the emergency room to get a refill for her seizure and asthma medications, as well as for swelling in her left knee (R. 218-219). Ms. Hawkins had run out of all her medications (*Id.*).

## C.

The hearing before the ALJ was held on February 8, 1999 (R. 304). Besides hearing testimony from Ms. Hawkins (already related above), the ALJ heard the testimony of a Medical Expert ("ME") and a Vocational Expert ("VE") (*Id.*). The testimony of these two experts is discussed in turn.

### 1. The Testimony of the Medical Expert

The ME who testified at the hearing was Benjamin Blackman, Ph.D., who is a psychiatrist (R. 352). Dr. Blackman began by testifying to his opinion that Ms. Hawkins suffered from a depressive disorder, even though "the record really doesn't specifically make that diagnosis" (R.

354). Nevertheless, the ME did point to evidence there was in the record supporting that opinion. The ME noted the examination by Dr. Langgut and the "severe difficulties" Ms. Hawkins had in the depressive area of the Beck Depressive Inventory testing conducted during that examination (*Id.*). The ME indicated that the results of this testing revealed that Ms. Hawkins often feels helpless and pessimistic, has a limited amount of energy, and also exhibits a decreased a ability to derive pleasure from previously pleasurable activity - a condition known as anhedonia (R. 354-355). This anhedonia was described as "the keystone of a depressive disorder" (*Id.*). Additional signs of a depressive disorder included significant weight fluctuation, tearfulness, feelings of sadness and fretfulness and a tendency for Ms. Hawkins to be awakened in the morning (*Id.*). The ME also noted that there was no evidence of alcoholism, and that alcohol in no way exacerbated Ms. Hawkins depressive disorder (R. 356).

In summary, the ME did not find that Ms. Hawkins' depressive disorder satisfied the Agency's severity requirements, but that she nevertheless suffered from a "severe mental impairment" (R. 357). This impairment moderately limited Ms. Hawkins' activities of daily living and social functioning, and would also often interfere with her concentration, persistence and pace in regard to complex tasks (*Id.*). It was the ME's opinion that Ms. Hawkins is mentally capable of working only on simple, repetitive one or two step tasks (including assembly line or production work) (R. 358-359). In making these statements, the ME admitted that his knowledge of these unskilled jobs was only the same as that of an "ordinary citizen" (R. 363).

### 2. The Testimony of the Vocational Expert

The VE who testified at the hearing was a vocational rehabilitation counselor, Ms. Julie Bose (R. 367). The VE began by addressing Ms. Hawkins' past work experience (*Id.*). According to the

13

VE, the plaintiff's prior work as both a sitter and as a CNA would be classified as being at the low end of the semi-skilled level and gave the plaintiff no readily transferable skills (R. 367-368). The ALJ then began to ask the VE hypothetical questions based upon Ms. Hawkins' age, education and vocational background (R. 368).

In his initial hypothetical, the ALJ assumed an individual who: could perform light work, could lift ten pounds frequently, could lift twenty pounds occasionally, could not stand more than an hour at a time, required a sit/stand option at the will of the worker, and was mentally limited to performing simple one or two step tasks (*Id.*). In response, the VE testified that such an individual would be unable to perform Ms. Hawkins' prior employment (*Id.*). The ALJ then asked whether such an individual would be able to perform in any other jobs which exist in the national economy (*Id.*). The VE stated that the only available jobs would be in the sedentary and light range of unskilled labor, and that the potential employment opportunities in this category would be further limited by the requirement of a sit/stand option (R. 369). The jobs that the VE identified as existing in the Chicago metropolitan area included: 3,500 to 5,000 mail clerk positions; 10,000 to 11,000 bench assembler positions; and 4,200 to 4,400 inspector or manufacturing inspector positions (R. 369-370). The VE qualified these estimates by noting that the bench assembler employment would not include working on an assembly line, as the sit/stand option would preclude such work (*Id.*).

The ALJ then modified his hypothetical by retaining the same basic profile, but restricting the person to only one and two step sedentary work that allowed the worker to be able to change positions at will and continue to work while standing (R. 370). The VE noted that this would significantly reduce the available positions, but specifically noted that available jobs in the Chicago metropolitan area included: a reduction to 2,000 to 2,500 bench assembler positions; 1,200 to 1,400

14

hand packer positions; and 2,400 to 2,500 information clerk positions (R. 371). A final hypothetical

was offered by the ALJ that included the same basic profile, but also included the requirement that

the worker be entirely off her feet due to pain, as well as a requirement that the worker be allowed

a rest of at least a half an hour every two hours (*Id.*). The VE testified that there were no jobs

available for such a hypothetical worker (*Id.*).

The VE was then questioned by the plaintiff's attorney, who offered yet another hypothetical.

In essence, this hypothetical consisted of the ALJ's second hypothetical, with the following

additional restrictions: the worker is precluded from work around heights or moving machinery, is

precluded from working around concentrations of pulmonary irritants, has a seriously limited ability

to relate to coworkers, a seriously limited ability to use judgement, a seriously limited ability to deal

with work stress, a seriously limited ability to function independently and a seriously limited ability

to maintain attention and concentration (R. 372). The VE determined that such a person would be

unable to perform any type of job, specifically basing her opinion on the serious limitations in the

ability to work with coworkers, deal with work stress and maintain attention and concentration (R.

372).

## D.

The ALJ issued its decision on October 29, 1999 (R. 14-30). The ALJ applied the standard,

five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920 (2002). At Step 1,

the ALJ found that Ms. Hawkins had not engaged in any substantial gainful activity since April of

1996 (R. 19). Furthermore, at Step 2 the ALJ found that Ms. Hawkins has a number of medically

determinable severe impairments, including: depression; degenerative arthritis with mild bulging

discs and advanced disc degeneration; a history of asthma and seizures; and, finally, alcohol abuse

in partial remission (R. 25). However, at Step 3 the ALJ determined that the record does not establish that Ms. Hawkins is subject to any impairment or combination of impairments that meet or equal the specifications of an impairment listed in the Agency regulations (*Id.*).

In making this determination at Step 3, the ALJ found that "there are some inconsistences" in the record (R. 23). With regard to Ms. Hawkins' claim that her back problems disable her, the ALJ noted that Ms. Hawkins has a fairly full range of motion, a wide range of daily activities, and only takes Ibuprofen for her pain (*Id.*). The ALJ also addressed Ms. Hawkins' history of seizures, noting that there was significant evidence of both alcohol use and non-compliance with seizure medication (*Id.*). The ALJ found that these factors were the cause of the majority of Ms. Hawkins' seizures, and that even despite these aggravating factors the seizures were few in number over the past few years (*Id.*). Finally, the ALJ considered the evidence of depression. The ALJ found that Ms. Hawkins suffered from a depressive disorder that often caused "deficiencies of concentration for complex or highly detailed tasks, but only slight deficiencies in doing simple tasks" (*Id.*). The ALJ both agreed with and relied upon the testimony of the ME, Dr. Blackman, to the effect that Ms. Hawkins was mentally able to perform "routine, 1-2 step unskilled tasks" (*Id.*).

The ALJ then moved on to Step 4. At this stage the ALJ determined Ms. Hawkins' Residual Functional Capacity ("RFC"). In so doing, the ALJ found that Ms. Hawkins was "not as limited as she alleges" (R. 24). The ALJ found the Ms. Hawkins had the physical ability to lift up to 20 pounds occasionally and 10 pounds frequently, as well as the physical ability to stand/walk/sit up to 6 hours in an 8 hour day (so long as she can alternate between positions every hour) (*Id.*). Therefore, the ALJ found that Ms. Hawkins is now limited to light work (*Id.*). Additionally, Ms. Hawkins was limited to simple, unskilled 1-2 step tasks due to the difficulties identified by the ME (*Id.*). Due to

all these limitations, the ALJ determined that Ms. Hawkins was not capable of performing her past relevant work at Step 4 (R. 24).

The ALJ then determined at Step 5 that Ms. Hawkins not disabled (R. 25). The ALJ cited to the answer the VE gave to a hypothetical containing the limitations outlined above (*Id.*). The VE identified a number of jobs as being available in the Chicago metropolitan area (*Id.*). These include, at the light level, 3,500 to 5,000 mail clerk positions, 10,000 to 11,000 bench assembler positions, and 4,200 to 4,400 inspector or manufacturing inspector positions (*Id.*). At the sedentary level, the VE identified 2,000 to 2,500 bench assembler positions, 1,200 to 1,400 hand packer positions, and 2,400 to 2,500 information clerk positions (*Id.*). The ALJ found these to be a significant number of jobs, and also found them to be jobs that Ms. Hawkins could in fact perform (*Id.*).

## II.

In order to establish a "disability" under the Social Security Act (the "Act"), a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A)(2002). A claimant must demonstrate that her impairments prevent her from performing not only his past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The social security regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. § 404.1520 (2002). Under this rule, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe

17

as to preclude substantial gainful activity; (4) whether the claimant is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir.1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. § 404.1520(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work in the national economy (other than the relevant past employment). *See Bowen v. Yuckert,* 482 U.S. 137, 142 (1987); 20 C.F.R. § 1520(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and

give greater weight to that which the ALJ finds more credible). The Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir.1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (per curium).

However, the Commissioner (or ALJ) is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review); *Guercio v. Shalala*, No. 93 C 323, 1994 WL 66102, at *9 (N.D. Ill. March 3, 1994) (ALJ need not spell out every step in reasoning, provided the ALJ has given sufficient direction that the full course of the decision may be discerned) (citing *Brown v. Bowen*, 847 F.2d 342, 346 (7th Cir.1988)). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *See, e.g., Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir.2001) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing Court can ultimately assess whether the ALJ's

determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (quoting *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000)).

III.

Ms. Hawkins challenges the ALJ's findings at Step 3. She does not challenge the ALJ's Step 1, 2, 4 or 5 determinations.[4] We therefore only address the ALJ's Step 3 determination.

A.

As indicated above, a Step 3 finding requires the ALJ to determine whether the claimant's limitations (found severe at Step 2) meet or equal a listed disability found within 20 C.F.R. Part 404, Appendix 1, Subpart P. Ms. Hawkins contends that the ALJ lacked substantial evidence for his Step 3 determination and she makes a number of arguments in support of this contention: (1) the ALJ impermissibly "played doctor" to interpret the significance of the MRI taken on August 17, 1999 (six months after the hearing); (2) the ALJ improperly relied on Ms. Hawkins' use of mere non-prescription medications for her pain to find that her claims of pain did not satisfy a listed impairment at Step 3; (3) the ALJ erred by relying on the testimony of Dr. Benjamin Blackman, a reviewing psychiatrist called as a medical expert to testify to Ms. Hawkins' mental and emotional condition; (4) the ALJ erred by dismissing an assessment of plaintiff's condition by Dr. Langgut; and (5) the ALJ erred in relying upon Ms. Hawkins' non-compliance with her seizure medication as evidence that she was not disabled. In considering these arguments, we begin by summarizing the ALJ's review and analysis of the evidence.

---

[4]Ms. Hawkins' failure to challenge the ALJ's findings at these steps constitutes a waiver of any arguments that might be made with respect to these steps. *See generally, Aikens v. Shalala*, 956 F. Supp. 14, 22 (D.C. 1997). For that reason, we do address the evidence that applies to the Step 5 determination (*e.g.*, the VE's testimony, and Dr. Villaflor's RFC Assessment (R. 161)). We note, however, that our review indicates that there was substantial evidence for the ALJ's Step 5 finding.

The ALJ began his determination by recognizing each of the claimed impairments that he found severe at step two of the sequential analysis: a depressive disorder; degenerative arthritis with mild bulging discs at L3-S1 and a lumbar laminectomy at L5-S1; a history of asthma; a history of seizures (in partial remission); and alcohol abuse (in partial remission). The ALJ then reviewed the medical evidence in the record.

The ALJ wrote that, on September 19, 1997, Dr. Thawani, a treating physician for Ms. Hawkins, reported that, although Ms. Hawkins had a back problem due to a work injury and resulting pain that decreased the range of motion in her back, she walked unassisted. Dr. Thawani also indicated that there was no evidence of asthma in her lungs or end organ damage from it and that she was in non-compliance with her asthma medications (*e.g.,* a ventolin inhaler and TheoDur tablets) (Ex. 2F). Dr. Thawani indicated that Ms. Hawkins appeared quite "depressed and tearful" and that he had "recently seen her in a depressed mood," although the doctor attributed that to a lawsuit then pending against her employer (R. 20).

The ALJ then discussed the report of Dr. Dovale, who found that there was no evidence of drug or alcohol abuse by Ms. Hawkins (although she admitted drinking). Dr. Dovale also reported that Ms. Hawkins denied using any medication for back pain; she had a full range of motion at the hips, knees and ankles; could climb onto and off of the examination table (although she favored her lower right extremity when she walked); and she had only slightly decreased breathing in her lungs. Dr. Dovale's diagnosis was that she had lower back pain, mild asthma, a history of seizures, depression and "mildly advanced degenerative changes with degenerative disc pathology at L4-5" (R. 21; Ex. 4F).

The ALJ then discussed Dr. Luchetta's psychiatric evaluation of Ms. Hawkins. Dr. Luchetta found that Ms. Hawkins experienced seizures from drinking alcohol, but had been abstinent from drinking for six to seven months prior to the exam (concluding that alcohol abuse was in early to partial remission). The ALJ noted that Dr. Luchetta described what Ms. Hawkins reported to him as lower back pain, depression, and an ability to perform a range of daily activities that including cooking, taking care of finances, laundry, and entertainment such as television, reading and doing crossword puzzles (R. 21; Ex. 5F). Dr. Luchetta also indicated that Ms. Hawkins' "thought processes were sequential" and she had the ability to recall digits when stated to her; to the extent that she did not successfully recall the digits, Dr. Luchetta "felt that this seemed to have been done purposely" (R. 22; Ex. 5F). In addition, "word object recall, recent and remote memory, calculations and abstract thinking were all performed correctly" (R. 22; Ex. 5F).

The ALJ then reviewed medical evidence of treatment notes from a hospitalization in March 1997 due to complaints of chest pains; hospitalization in 1998 from seizures (which indicated that she had not taken sufficient seizure medications); and treatment notes from the Department of Public Health from December 1998 through August 1999 that showed Ms. Hawkins had been treated for complaints of occasional low back pain, leg cramps, seizures generally controlled with medication, occasional numbness in the feet since back surgery; and abdominal pain and a toothache. During that time period, the Department ordered an MRI of Ms. Hawkins' lower back, which was taken on August 17, 1999, and which was evaluated by Dr. Marvin Petry (R. 22). The ALJ stated that the MRI "revealed mild disc bulging at L3-S1 with no definite disc herniation; narrowing of the spinal canal at L3-L5; and moderate thecal sac deformity and nerve root clumping at L4-5" (R. 22; Ex. 15F).

22

Finally, the ALJ discussed the testimony of Dr. Benjamin Blackman, a "reviewing psychiatrist" called as a medical expert for the administrative hearing. According to the ALJ, Dr. Blackman testified that Ms. Hawkins had a depressive disorder, but the only evidence of its severity came from a consultative examination by Dr. Langgut in October 1998 (R. 22, citing, Ex. 11F (Langgut Report)). The ALJ said that "[i]t was Dr. Blackman's opinion that Ms. Hawkins' depression does not meet the severity criteria of Listing 12.04" (R. 22). The ALJ further stated that it was Dr. Blackman's opinion that Ms. Hawkins' depression did not meet the severity criteria of Listing 12.04, even though Dr. Blackman believed that Ms. Hawkins was "significantly limited in doing complex tasks requiring independent judgment," because he "opined that [Ms. Hawkins] is able to do simple, repetitive tasks and 1-2 step operations, such as assembly line and production work, without much difficulty" (R. 23). The ALJ stated that agreed with these opinions "as they are consistent with the record as a whole."

The "record as a whole" included not only the medical evidence summarized above, but also Ms. Hawkins' own testimony – both at the hearing and during various medical examinations – which the ALJ found contained "inconsistencies" (R. 23). For example, the ALJ found that "[a]lthough [Ms. Hawkins] alleges that she is unable to work due to lumbar laminectomy at L5-S1, at her consultative examination, she exhibited a full range of motion and no neuropathy, motor or sensory deficits" (*Id.*, citing Ex. 4F (Dovale Report)). The ALJ also explained that during her doctor and emergency room visits, "there were no significant motor/sensory deficits on exams except for slightly reduced leg motor strength" (R. 23, *citing* Exs. 14F and 16F).

The ALJ then stated that although the MRI "does establish significant lumbar disc degeneration with some spinal canal involvement," Ms. Hawkins was "only taking Ibuprofen for her

pain," and that her "relatively wide range" of daily activities showed that she was "well enough" to function on a variety of physical, psycho/emotional and mental levels (R. 23). The ALJ further found that Ms. Hawkins' testimony regarding her daily activities undermined the claim that her depression was severe enough to meet a Listing. And, the ALJ found that Ms. Hawkins' depression might "prevent her from doing skilled work or complex tasks," and created "deficiencies of concentration for complex or highly detailed tasks," she was able to do "simple tasks" and "perform routine, 1-2 step unskilled tasks" (R. 23). Finally, with respect to the medical evidence of asthma and seizures, the ALJ found a limited history of such conditions and an irregular history of medicinal compliance and alcohol consumption that exacerbated existing conditions.

Thus, although the ALJ found that Ms. Hawkins' claimed limitations were severe, he also found that they did not satisfy the test for disability at step three based on the evidence in the record and his evaluation of it, as offered above. We find that there is substantial evidence to support the ALJ's Step 3 finding, and thus reject each of plaintiff's criticisms of it for the reasons discussed below.

1.

The plaintiff's first contention is that the ALJ erred when he "played doctor" by relying on his own interpretation of an MRI, rather than calling a medical expert with particular knowledge of MRIs to provide an interpretation of its results (Pl.'s Mem. at 11). Specifically, Ms. Hawkins argues that the ALJ was not free to reach his own medical conclusions by simply relying upon his own unsupported opinion to ascertain the medical significance of the MRI regarding the severity of her pain. Ms. Hawkins argues that the MRI showed "clumping of the intradural nerve roots," and "spinal stenosis with deformity of the thecal sac and inflammation of the spinal cord membrane" (*Id.*,

citing R. 276), but the ALJ "rejected [her] testimony of pain" based on a consulting physician's statements that, in 1997, Ms. Hawkins "did not show sensory deficits or motor changes" (Pl.'s Mem. at 11).

The Court finds the MRI argument without merit. To begin with, the ALJ did not cavalierly embark on an untutored reading of the MRI film, interpret "raw data" (as Ms. Hawkins claims (Pl.'s Mem. at 10)) or re-interpret the MRI. Rather, it was Dr. Petry who read the MRI. The ALJ merely summarized the reading of that film that was made by Dr. Petry (*Compare* R.22 *with* R. 276-77). While the ALJ's summary contained a few inaccuracies, we do not view any of them to be significant.[5]

Moreover, to the extent that plaintiff argues that the ALJ was required to receive expert testimony as to the significance of the MRI findings, we disagree. Although "the procedure for adjudicating social security disability claims departs from the adversary model to the extent of requiring the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled," *Green v. Apfel,* 204 F.3d 780, 781 (7th Cir. 2000) (citing 20 C.F.R. § 416.927(a)(3)), we do not believe that this is such a case.

In summary, Dr. Petry said the MRI showed lumbar (lower back) vertebrae that were "normal in stature with no lesions;" a "mild degree" of spondylolisthesis (forward displacement of a vertebrae) L4 on L5; and degeneration of discs at L4-L5 and L5-S1 (R. 276). Dr. Petry's evaluation of that MRI does not state that these conditions should cause plaintiff to suffer from disabling pain.

---

[5] The ALJ noted "mild disc bulging with no definite disc herniation at L3-S1, whereas the MRI report refers to the bulging as "minimal" and as located at L5-S1. In addition, the ALJ noted "narrowing of the spinal canal at L3-L5," whereas the MRI report refers to the location as being at L4-L5. In any event, the plaintiff does not point to these minor discrepancies as the basis for her assignment of error.

The 1999 MRI, like Dr. Dovale's evaluation of plaintiff in 1997, post-dated her back surgery in 1996. Dr. Dovale, mindful of that surgery, put the plaintiff through a battery of tests and found no appreciable muscle spasming in her lower back; normal range of motion on flexion, extension and side-to-side bending; full range of motion at the hips, knees and ankles; no evidence of muscle atrophy (suggesting that she regularly used her muscles in performing various movements); the ability to do a right leg straight raise to 90 degrees without pain and a left leg straight raise to 60 degrees with only "slight" pain in the low back and left buttock (R. 130). Dr. Dovale described plaintiff as having "chronic low back pain without evidence of radiculopathy (disease of the nerve roots)" (R. 131). But, Dr. Dovale's assessment does not support the assertion of extreme pain that she described to Dr. Dovale, or testified to at the hearing.

Ms. Hawkins' own testimony about her daily activities provides support for the ALJ's finding at Step 3. The ALJ noted that the plaintiff "testified to a relatively wide range of daily activities" such as cooking and doing puzzles, grocery shopping (until November 1998), housework, and laundry once a week (R. 23). The ALJ also pointed out that Ms. Hawkins had been able to maintain a relationship with her boyfriend for the two years prior to the administrative hearing (R. 23, 168), and performed the role of primary caregiver for her fourteen year old grandson (R. 352). Certain of the limitations of the plaintiff's prior activities (such as, going out and playing bingo) were described by *her* as the result of financial – not physical – constraints.

Ms. Hawkins complains that this balancing or weighing of the evidence in the record as a whole was playing doctor. We disagree. It is the ALJ's job to weigh the evidence and reach conclusions about whether the substantial weight of the evidence in the record, as a whole, supports a finding of disabled or not disabled. *Richardson v. Perales,* 402 U.S. 389, 399-400 (1971)

(Commissioner responsible for weighing evidence, resolving conflicts and making independent findings of fact). The ALJ found that the MRI, as one piece of evidence, did not, by itself, support a disability finding based on pain, given the testimony regarding Ms. Hawkins' daily activities and the other medical evidence by a consulting physician. This balancing or weighing of the evidence is the ALJ's job; it is not a matter of playing doctor. *Id.* This Court may not re-evaluate that evidence. *Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999)(reviewing court may not reevaluate facts, weigh evidence anew, or substitute its judgment for that of the Commissioner).

Finally, to the extent that plaintiff viewed the MRI as warranting expert testimony to explain its significance, we wonder why plaintiff's counsel did not ask for it. The hearing in this case took place on February 8, 1999. The MRI was conducted six months later, in August 1999, and was submitted to the ALJ by plaintiff's counsel under a cover letter dated September 3, 1999 (R. 275). In that letter, counsel asked only that the ALJ "enter this evidence into claimant's hearing records"; she did not suggest that this evidence was inconsistent with the prior medical evidence, or that further expert evaluation or testimony of the MRI was warranted. If plaintiff's counsel deemed the MRI study to be worthy of further expert analysis, she should have so advised the ALJ. *Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994) (it is claimant's duty to furnish medical and other evidence that ALJ can use to reach conclusions about medical impairments and their effects on the ability to work). For this reason, too, we reject plaintiff's challenge to the ALJ's treatment of the MRI.

Ms. Hawkins also contends that the ALJ's reliance on her use of non-prescription pain medication "cannot be thought compelling evidence of lack of severe pain " (Pl.'s Mem. at 11).[6] Although we agree that this evidence alone is not "compelling," that does not mean the evidence lacks force as one factor in the mix of considerations. Our review of the ALJ's findings does not suggest that he placed exclusive, or undue, weight on this factor.

It was Ms. Hawkins' burden, not the ALJ's burden, to argue why the use of this pain medication was significant (or not) to her claim of disability based on pain. *See Young v. Secretary of Health and Human Services,* 957 F.2d 386, 389 (7th Cir. 1992). On this point, the Court finds that the burden of proof cuts against Ms. Hawkins. Although the ALJ must "provide a rational basis for the denial of benefits" and "build a bridge from the evidence to his conclusion," *Green,* 204 F.3d at 781, it was not the ALJ's burden to ask every conceivable question that might relate to or support the disability claims before him. And, while it is true that the ALJ "has a heightened duty to make sure that the record is developed when a claimant is unrepresented," *Luna,* 22 F.3d at 692, in this case, Ms. Hawkins was represented. Thus, Ms. Hawkins must bear the consequences of any failure to offer evidence that might have made a difference on the pain medication issue.

The ALJ's function was to evaluate the medical evidence in the record, to elicit sufficient testimony regarding the evidence the ALJ finds relevant to the disability determination where necessary, and to make findings that are supported by substantial evidence in the record. *Perales,* 402 U.S. at 399-400. He did so here. Based on our review of the record, the Court finds that the

---

[6]We note that Ms. Hawkins' argument about the non-prescription medication is different than her argument related to non-compliance with her seizure medications. We address the non-compliance with seizure medication argument *infra* pp. 32-33.

ALJ did not err at Step 3 by relying on an unsubstantiated interpretation of the MRI and/or failing to illicit testimony regarding Ms. Hawkins' use of non-prescription pain medication.

**3.**

Ms. Hawkins' next argues that the ALJ erred by relying on Dr. Blackman's opinion because it "was tainted by faulty vocational assumptions . . . ." (Pl.'s Mem. 14). In his testimony, Dr. Blackman stated that he believed Ms. Hawkins could do tasks such as assembly line and production work (R. 359). This statement, Ms. Hawkins contends, is evidence that Dr. Blackman's opinion is based upon "unqualified conclusions regarding [her] vocational abilities" (Pl's. Mem. 14).

We believe that Ms. Hawkins' argument misinterprets both the logic of Dr. Blackman's analysis and its role in the ALJ's decision. Dr. Blackman, a psychiatrist, testified that while Ms. Hawkins had a depressive disorder, she did not meet the severity criteria of the listings at 20 C.F.R. Pt. 404, Subpt. P, App. 112.04 (R. 22). He found that Ms. Hawkins was "significantly limited in doing complex tasks requiring independent judgment" (R. 22-23), but could "do simple repetitive tasks and 1-2 step operations" (R. 23). Dr. Blackman did not premise his analysis of Ms. Hawkins' abilities on the basis of what specific jobs she could or could not do. Instead, he analyzed her medical records to determine her mental limitations, and how those limitations affected her range of abilities. *Id.* In so doing, Dr. Blackman did nothing different than what was done by Dr. Langgut (upon whom plaintiff seeks to rely), who assessed Ms. Hawkins' psychological condition and how that condition affected her ability to do certain work-related activities (*see* R. 171-72).

Analyzing medical findings, and determining a patient's limitations in light of those findings, is precisely the correct role for a medical expert. In making his determination of Ms. Hawkins' limitations, Dr. Blackman was acting as an expert in his field. He did not, as Ms. Hawkins'

argument presumes, start with an assumption that some jobs require specific skills and others do not, and then determine Ms. Hawkins' limitations. Instead, he started with medical evidence and, based upon that evidence, determined Ms. Hawkins' limitations. Although he later offered an opinion about what specific jobs Ms. Hawkins could do, his knowledge of the stresses and skills of specific jobs, whether incorrect or not, were not the basis for his findings and did not prejudice the analysis of Ms. Hawkins' specific limitations. Moreover, the ALJ specifically stated – twice – that he was limiting Dr. Blackmun's testimony to the "area of his expertise" (R. 364, 366), and that his questions to Dr. Blackman were from a "medical standpoint" rather than a vocational one (*Id.*). In addition, the ALJ also clearly stated that he based his Step 3 findings on the record as a whole (R. 23-24), and not simply on Dr. Blackman's purportedly erroneous statements about which kinds of jobs he felt that Ms. Hawkins had the RFC to perform. We do not believe the ALJ erred in utilizing Dr. Blackman's testimony.

### 4.

Ms. Hawkins asserts that the ALJ improperly gave more weight to the "reviewing" psychiatrist's testimony than to the findings of Dr. Langgut, an "examining" psychiatrist (Pl.'s Mem. at 14). We disagree with Ms. Hawkins' reading of what the law requires with respect to experts.

As a preliminary matter, it is important to recognize that the federal regulations cited by Ms. Hawkins with regard to the opinions of examining sources rather than reviewing sources only requires that an examining physician's testimony "generally"– not "always" – be given more weight than a reviewing source. 20 C.F.R. § 416.927(d)(1). Under the regulations, factors such as the degree to which an opinion is consistent with the record as a whole should also be considered. *Id.* at (d)(3)-(4). Medical opinions may be discounted if "specific, legitimate reasons constituting good

cause are shown for rejecting them." *See Knight v. Chater,* 55 F.3d 309, 313-14 (7th Cir. 1995) (citing 20 C.F.R. §§ 404.1527(c)-(d)). Evidence of an internal inconsistency or an inconsistency with other medical evidence in the record may constitute a legitimate reason for rejecting an opinion by an examining physician. *Id.*

Although the ALJ's analysis does not specifically mention Dr. Langgut's findings, it does not simply ignore them. The ALJ makes specific reference to the testimony of Dr. Blackmun, and Dr. Blackman's review of "the October 1998 consultative examination" – which is Dr. Langgut's evaluation (R. 22, citing Ex. 11F). In our view, this reference satisfies the minimal articulation test set forth in the governing case law. *See Zurawski,* 245 F.3d at 888. The ALJ's decision discusses the reasons given by Dr. Blackman for rejecting any opinions by Dr. Langgut that Ms. Hawkins had a severe depression disorder and concluding that Ms. Hawkins' depression did not meet the severity criteria of Listing 12.04. Specifically, the ALJ commented that Dr. Blackman found that, although Ms. Hawkins was significantly limited in her ability to perform complex tasks requiring independent judgment (based on her depression), she could still do simple, repetitive tasks. The ALJ found Dr. Blackman's analysis and testimony consistent with the other medical evidence in the record, including that provided by Dr. Luchetta, who was also an "examining" psychiatrist. Because the analyses of Drs. Blackman and Luchetta are consistent with the other evidence in the record,[7] they establish a reasonable basis for the ALJ's decision to discount Dr. Langgut's review of the "Medical Assessment of Ability to do Work Related Activities" form.

_____

[7]Two such pieces of evidence, not specifically called out (and not required to be called out by the governing legal standards) are Exhibits 7F and 8F, which are medical assessments by Drs. Boyenga and Heinrich. We have discussed the content of these assessments *supra* p. 8. Here, we merely note that Dr. Heinrich found Ms. Hawkins "not significantly impaired" with respect to her mental and social skills and only "moderately limited" in her ability to concentrate. And Dr. Boyenga reiterated the substance of those conclusions, finding that Ms. Hawkins had only slight limitations, if any.

31

Moreover, plaintiff points to nothing in Dr. Langgut's evaluation that indicates that Ms. Hawkins' depression meets Listing 12.04. Indeed, while Dr. Langgut expressed concern about Ms. Hawkins' ability to utilize SSI funds if awarded, he did *not* opine that her depression would preclude her from all work-related activity. To the contrary, he found Ms. Hawkins had the ability to understand, remember and carry out simple job instructions, to follow work rules, and to interact with supervisors. He noted that any limitations that Ms. Hawkins might have in "a work related environment appear largely to be the result of physical pain and restrictions" – not due to depression (R. 172). The Langgut opinion, therefore, is not inconsistent with the ALJ's finding at Step 3, and does not advance plaintiff's claim.

**5.**

Ms. Hawkins' last argument is that "the ALJ's determination that [her] medical history contraindicates disabling pain is unsupported by substantial evidence" (Pl.'s Mem. at 17). In his decision, the ALJ stated that Ms. Hawkins' non-compliance with her medication as "the cause of her seizures and other health complications" was one of the bases for his determination that she was not disabled on the basis of those seizures (Pl.'s Mem. at 17). Ms. Hawkins cites the case of *DeFrancesco v. Bowen,* 867 F.2d 1040, 1043-44 (7th Cir. 1989), for the proposition that non-compliance with medications cannot be used as the basis for a non-disabled finding if the claimant cannot afford to pay for such medication.

The problem with this argument is that the evidence of record is insufficient to bring the *DeFrancesco* principle into play. Ms. Hawkins' testimony regarding the reasons for her history of non-compliance with seizure medication is varied. For example, although she testified that there was about a one-year period between the time when her medical card was "cut" in mid-1997 (we are left

32

to wonder why that happened, because no one tells us that), and the time when she obtained a new one (*i.e.*, November or December 1998) from the "Bureau of Health" (at her fiancee's suggestion), Ms. Hawkins indicates that she was only without medication for a five- to six-month period during that time because: (1) she had a reserve supply of unused medication (*e.g.*, Dilantin and Phenobarbital) which she had obtained from her treating physician by prescription refill before her medical card was "stopped"; and (2) her son bought her medication for a few months after the medical card could no longer be used with his own money (R. 327-330).

Moreover, Ms. Hawkins admitted that even when she had the prescription medications available, she "would forget to take the mediation" -- sometimes for a "month and a half" (R. 326). Although Ms. Hawkins also testified that after she obtained her new medical card in late 1998, she began taking the medications regularly (R. 327); she also testified that she had experienced a seizure several weeks before the administrative hearing (held on February 8, 1999) because she had not taken her medications (R. 312, 326). There is no evidence that regular use of medications would not control the onset of her seizures (*Id.*). But, there is evidence that Ms. Hawkins' failure to take medication when it was available also contributed to the onset of the seizures (R. 312, 326), as did her past alcohol use (R. 133). The ALJ's opinion addresses the issue of Ms. Hawkins' non-compliance as follows:

> In terms of her asthma and seizures, I find that despite a very irregular history of seizure medicine compliance, the claimant had only a few seizures in the past several years, and these generally resulted from non-compliance, which she admitted to. Additionally, Ms. Hawkins testified that she still consumes a few drinks of brandy once a week, and while that is a lot less than in the past, it still may be contributing to her additional seizures.

(R. 23).

In light of this record, we find that the ALJ's reference to Ms. Hawkins' failure to take seizure medication does not undermine his Step 3 determination. To begin with, reading the record most favorably to Ms. Hawkins, any financial inability to obtain the medicines lasted at most for a five- to six-month period in late 1997 or 1998. The legal standards governing disability claims require that the claimed disability translate into an impairment that renders the person unable "to engage in any substantial gainful activity" for " a continuous period of at least 12 months." 20 C.F.R. § 416.920(a). In this case, any seizure impairment that resulted from lack of funds to pay for medication did not last for twelve months (the minimum required) or more, because Ms. Hawkins obtained a new medical card, obtained more medicine, and then began using it (for the most part) regularly (R. 327).

Moreover, *DeFrancesco* holds that the social security statute requires that the claimant's disability be total and "contains only a limited notion of contributory fault. If the claimant has inexcusably refused to follow prescribed medical treatment that would eliminate his total disability, then [s]he isn't totally disabled." 867 F.2d at 1043. "Inexcusable" conduct includes lack of discipline such as forgetfulness. *Id.* at 1044. Although the ALJ did not cite to Ms. Hawkins' inability to pay for seizure medications for a period of time due to a "stopped" or "cut" medical card (R. 23), the evidence shows, as Ms. Hawkins admits, that her seizures have been occurring since 1973, and that over the long period of time between 1973 and 1997, these seizures resulted – at least in part – from her failure to take her medication (even when she had it) due to forgetfulness, not from lack of funds (R. 327, 330). And, there is no evidence that she lacked funds to obtain seizure medication since her medical card was renewed in late 1998, or that – when she takes the medication – her seizures are uncontrollable. To the extent that Ms. Hawkins' non-compliance with taking her seizure

34

medications resulted from forgetfulness, this forgetfulness contributed to her seizure problems (R. 327-28), and does not support a finding of total disability.

For these reasons, we think the ALJ's Step 3 determination was supported by substantial evidence. Based on the medical history of Ms. Hawkins' seizures, Ms. Hawkins had only "a few seizures in the past several years, and these *generally* resulted from non-compliance which she admitted to" (R. 23) (emphasis added). Ms. Hawkins has pointed us to no evidence to the contrary, and we have found none. Therefore, we reject Ms. Hawkins' argument that the ALJ erred by finding that her non-compliance with anti-seizure medication belied her claim of a disabling physical condition due to seizures (or pain from them) (Pl.'s Mem. at 17).

## CONCLUSION

Accordingly, IT IS THEREFORE ORDERED that Ms. Hawkins' motion for summary judgment be denied (doc. # 17), and the Government's motion for summary judgment be granted (doc. # 22). This case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated: March 28, 2003